JAMES STEWART & COMPANY, INC., Claimant, *v.* THE STATE OF NEW YORK.

Claim No. 15294.

Court of Claims, October, 1923.

*Claims against state — misrepresentation by state as to character of materials to be excavated from Barge canal — fraud — claimant entitled to recover extra expense occasioned.*

Smith, J., dissents.

CLAIM for breach of canal contract.

*O'Gorman, Battle & Vandiver* and *Battle, Vandiver, Levy & Van Tine* (*Almuth C. Vandiver*, of counsel), for claimant.

*Charles D. Newton*, attorney-general, *Carl Sherman*, attorney-general (*William E. Thorpe*, *Edward J. Mone* and *Clifford Couch*, deputy attorneys-general), for State.

ACKERSON, P. J. This claim, as amended, asks for damages against the state for more than $400,000. The claimant (the claimant and its assignors are both referred to herein as the claimant) contends that it has been damaged in that amount by reason of the misrepresentation made by the state as to the materials to be excavated in the canal prism on the site of contract No. 39, which it entered into with the state. This contract was made and entered into by the state and this claimant in pursuance of the law which provided for the construction of the Barge canal. This law provided in general that the state would investigate the site of the contract, determine the quantity of materials to be removed therefrom, and estimate as accurately as possible the approximate cost of removing such materials; nothing is said in the law about determining the quality of the material to be removed, but of course it was absolutely necessary to do this in order to make an accurate estimate of the cost of removing such material; that the state should then prepare plans and specifications setting forth upon said plans the nature of the work to be performed and a description of the material to be removed from the prism of the canal, as far as possible.

The state spent some three or four months, all told, in investigating the site of this contract, and in making rod soundings, wash

drill borings, etc., in an effort to acquaint itself with the nature of the materials to be removed, so that plans showing the work to be done and an estimate of the cost of such work could be accurately made. Thereafter and about February 1, 1910, the state advertised for bids on this contract. The advertisement provided that bids must be submitted on March 29, 1910, or thirty-six days from date of advertisement. The state's estimate for excavating the material to be removed from the prism of the canal on the site of this contract was seventy-seven cents per cubic yard. The claimant's bid was eighty-three cents a cubic yard, and being the lowest bid it was awarded the contract.

The contract presented to the claimant for signature was one drawn and prepared by the agents of the state. It provided, among other things, that the contractor must rely upon the information gained by what investigation he had made of the site of the contract. The law specifically provided that the agents of the state should procure this information themselves and make a " statement thereof with * * * maps, plans and specifications " which they should publicly exhibit " to every person proposing or desiring to make a proposal for such work." Section 6 of the Barge Canal Law (Laws of 1903, chap. 147) reads, in part, as follows:

" § 6. All the work herein authorized shall be done by contract. Before any such contract shall be made the state engineer shall divide the whole work into such sections or portions as may be deemed for the best interests of the state in contracting for the same, and shall make maps, plans and specifications for the work to be done and materials furnished for each of the sections into which said work is divided and shall ascertain with all practicable accuracy the quantity of embankment, excavation and masonry, the quantity and quality of all materials to be used and all other items of work to be placed under contract and make a detailed estimate of the cost of the same, and a statement thereof with the said maps, plans and specifications, when adopted by the canal board, shall be filed in his office and a copy thereof shall be filed in the office of the superintendent of public works and publicly exhibited to every person proposing or desiring to make a proposal for such work."

It is apparent that it was wholly impracticable for the contractor to make any adequate investigation of the site of this contract during the thirty-six days between the date of advertisement for bids and the submission thereof. It is obvious that the bidder had no equality of opportunity with the state to examine the site of this contract. The law plainly provided that the state itself should make this investigation. Not only that, but it provided

that the state should make an accurate estimate of the cost of doing this work. Then, in addition, it provided that no bid for doing the work could be accepted which was more than ten per cent in excess of the cost estimated by the state, without the consent of the canal board. But notwithstanding this plain provision of the statute which placed upon the state the responsibility of giving to the bidder an approximately accurate statement of the work to be done, the agents of the state sought to place upon the contractor the entire responsibility of determining at least the character of the material to be removed from the prism of the proposed canal. Then in addition to this, the agents of the state limited the time in which the contractor should make this investigation to such an extent that it became totally and absolutely impossible for the contractor to make any such investigation. In addition, the contract provided in section 10 thereof, in substance, that the contractor would not make any claim against the state for any misrepresentation made by any agent or employee of the state concerning any of the work mentioned in the contract.

The claimant in this case contends that it was compelled to rely upon the representations, as to the material to be removed, made by the state; that it could not make subsurface investigation of about eleven miles, mostly in the bed of the Oswego river, in February and March when climatic conditions forbid such investigation, and when the course of the proposed canal was not buoyed out, so that it could know where to make its soundings, to say nothing about the flood conditions of the river which prevented it.

Acting, therefore, upon the theory that the state had performed the duty imposed upon it by statute and had represented upon the plans and specifications furnished to the contractor the nature of the materials to be removed with approximate accuracy, and had estimated the cost of such work at seventy-seven cents per cubic yard with approximate accuracy, the claimant herein made its bid of eighty-three cents per cubic yard for doing this work, with perfect confidence that the work could be performed for that amount of money.

As the work progressed, it was found that there was a wide variance between the materials actually met with in excavating the prism of the canal and the materials represented to be there by the state upon its plans and specifications. The claimant was continually calling the state's attention to this variance. But, not until after the work was actually performed, and even after the commencement of the trial of this action for damages, was it discovered that these misrepresentations of the state were made by the agents and employees of the state with full knowledge of their falsity.

The state investigated the site of the contract, with its own boring parties, under the supervision of its state engineer. It also procured the boring books of the United States Deep Waterway Survey, a survey which had been made practically over this same route by the United States government a few years before. The time spent by the state and the United States government in procuring the information set forth in these boring books amounted in all to about four months, extending over three or four years.

The agents of the state were, therefore, thoroughly acquainted with the character of the material to be removed from the prism of the canal on the site of this contract. They also knew it was impossible for the claimant to make any subsurface investigation in the short space of thirty-six days which would reveal the nature of the material to be excavated.

After the claimant commenced the work of excavation on the contract, it immediately discovered that the material was much harder and more difficult of excavation than that which was represented on the contract plans. They immediately called the attention of the engineers of the state to this discrepancy but were told that they must proceed with the work of the contract. They proceeded under a continual protest and finally completed the work. Owing to the hard nature of the material, however, it took them about seven years to complete the work which the contract specified should be done in about three. After the completion of the work to the satisfaction of the state they were paid therefor in accordance with the contract price. The claimant now brings this action to recover the amount it was damaged by reason of being compelled to excavate a large amount of hard material not shown on the contract plans. The nature of the action is one for breach of warranty or condition consisting of misrepresentation made by the defendant in its plans and specifications as to the character of the material to be excavated and the suppression of information as to the true nature of such material.

It now clearly appears from the evidence in this case that the engineers of the state set forth information on the contract plans and specifications herein relating to the material to be excavated under the contract herein, which they knew to be false when they placed it on such plans and specifications. It abundantly appears from the evidence that such engineers and agents of the state deliberately represented on said plans and specifications that the nature of the material to be excavated was much softer and easier of excavation than it actually was and as they knew it to be as is fully set forth in our findings herein.

These engineers in their zeal for rendering efficient service to the state, undoubtedly satisfied themselves that such a perform-

ance on their part was justified in order to protect the state. But in law their acts constituted nothing less than fraud. They knew the facts. They knew that the representations on the plans as to the material were false. They knew that the plans were to be presented to proposers under the law to inform them of the nature of the work to be done. They knew that the quantity of hard material indicated upon the plans had a direct and vital bearing on the value of the work and they knew that the bidders and proposers relied upon the plans which these engineers made for their knowledge of the nature of the material to be removed. By such fraud, therefore, bidders were induced to believe that the material to be removed was much easier of excavation than that which the engineers of the state had found to actually exist on the site of the contract.

The attorney-general contends that clause 10 of the contract protects the state from damages and renders the claimant remediless. That clause reads as follows: "The contractor agrees that he has satisfied himself by his own investigation and research regarding all the conditions affecting the work to be done and labor and material needed, and that his conclusion to execute this contract is based on such investigation and research, and not on the estimate of the quantities or other information prepared by the state engineer, and that he shall make no claim against the state because any of the estimates, tests or representations of any kind affecting the work made by any officer or agent of the state, may prove to be in any respect erroneous."

Representations known to be false when made and made with a purpose to deceive, as in this case, are not within the purview, scope, meaning or contemplation of clause 10 of the contract.

Such a clause could avail the state only in the case of "erroneous" information furnished by its agents through an honest mistake. Such a mistake consists in giving "erroneous" information which was intended and believed to be the truth by the one giving it. That, of course, is not this case.

The fraud of the agents of the state cannot, of course, be attributed to the state. Here the principle of *respondeat superior* does not apply. The state cannot be guilty of fraud nor can an action sounding in tort be maintained against it without its consent expressed by legislative act. No damages in this case, therefore, for fraud nor of a punitive nature can be awarded against the state.

Inasmuch as the "representations" from which the claimant suffered were fraudulent it is relieved from the obligation imposed upon it by clause 10 not to make a claim against the state because of erroneous representations affecting the work made by any

officer or agent of the state. It can have redress for the fraud only against the agents of the state personally who actually committed the fraud. Being relieved, however, from the prohibition of clause 10, " not to make a claim against the state because any of the estimates, tests or representations of any kind affecting the work made by any officer or agent of the state may be in any respect erroneous," this claimant in our judgment is entitled to have its claim here considered upon the merits. We reach the conclusion that the claimant here is entitled not only to the contract price of eighty-three cents per cubic yard, but in addition it is entitled to recover the actual extra expense it was occasioned in doing the excavation work here by reason of the hard material it encountered not shown on the contract plans and known to the state to exist, which amount we have determined from the evidence is $369,237.

We also think the evidence in this case abundantly justified an award for the sum we have allowed in our findings under items 3, 9 and 10 of the claim.

There not being sufficient evidence to support an award for any other items of the claim, they are hereby dismissed.

We are not unmindful of the matters set forth in the able dissenting opinion of our colleague, Judge Smith. He heard the oral argument of counsel when this case was finally submitted and has given the briefs and record in this case long and careful consideration. He has reached conclusions with which the majority of the court, after full consideration, is unable to agree.

He has suggested certain findings which he thinks the court ought to incorporate in the findings of fact and conclusions of law which make up our decision. We do not think such suggested findings have any reference to the merits of the controversy and have, therefore, declined to incorporate them in our findings.

WEBB, J., concurs.

SMITH, J. (dissenting). This claim grows out of a Barge canal contract and, as presented, sought to recover against the state on eleven separate items.

The decision of the presiding judge, concurred in by Webb, J., has been to allow claimant recovery on item 1 in the amount of $369,237; on item 3, $23,537.14; on item 9, $7,974.58, and on item 10, $1,369.15, a total of $402,117.86.

I dissent from so much of the opinion and decision as results in the allowance to claimant of $369,237 on item 1 of the claim.

Claimant's contract was for dredging a channel in the Oswego river between Three Rivers and Fulton, a distance of about eleven miles, and work incidental thereto, and so far as it affects item 1 of the claim, called for the excavation of all of the material of every

name and nature within the site of the contract and within the lines and to the grade shown on the contract plans for the unit price of eighty-three cents per cubic yard.

The contract was let by the state after competitive bidding, as required by law, to James C. Stewart and Alexander Stewart, a copartnership doing business under the firm name of James Stewart & Company, on April 15, 1910, and was assigned by the copartnership, on or about January 9, 1913, to this claimant, a corporation, which assignment became effective on June 18, 1913, the date of its approval by the state superintendent of public works.

By item 1, claimant seeks to recover damages alleged to have been occasioned by breaches of warranty, inaccurate, incorrect, false, fraudulent, deceptive, mistaken, erroneous and misleading information and representations of the state of New York, its officers, agents and servants, with reference to the material which would be encountered by the contractor under this contract in the course of the performance thereof. Briefly stated, the claim is that the preliminary explorations undertaken by the state for the purpose of ascertaining the character of material to be excavated were conducted in a negligent, careless and unskillful manner, and by inexperienced and incompetent persons; that some of the persons making these preliminary explorations did not record the results of all of the soundings which they made, and as to other soundings, recorded results other than, and different from, the facts as ascertained by them; that engineers in the employ of the state, in the preparation of the contract plans, failed to note thereon some of the information disclosed by the sounding records, but did note on the plans conditions not obtained from, and not in agreement with, any sounding records.

As a result of all of this it is claimed that the plans when completed and exhibited to claimant's assignors for bidding were inaccurate, untrue and grossly misrepresentative of the actual conditions which a contractor performing the contract would be obliged to encounter; that this condition was known by certain of the state's officers and employees, and should have been known by the state officers in positions of responsibility and authority. It is claimed that claimant's assignors relied thereon in making their bid for this work and were deceived, and that they and claimant, who after the assignment of the contract performed a considerable portion of the work thereof, suffered great damage.

The prevailing decision of this court has sustained this contention of claimant and has fixed the damage so sustained at the sum of $369,237.

Before claimant's assignors submitted their bid for this work,

there was furnished to them a pamphlet called " Information for Proposers," which contained, among other information, the following paragraphs:

" The estimate of quantities is to be accepted as approximate only, proposers being required to form their own judgment as to quantities and *character of work*, by personal examination upon the ground where the work is proposed to be done; and on the specifications and drawings relating thereto, or by other means as they shall choose.

" The attention of persons intending to make proposals is specifically called to Paragraph Ten of the form of contract, which debars a contractor from pleading misunderstanding or *deception* because of estimates of quantities, *character*, location or *other information exhibited by the State.*"

Paragraph 10 of the formal contract, referred to in the " Information for Proposers " above quoted, which contract was signed by claimant's assignors, is in the following language:

" The contractor agrees that he has satisfied himself *by his own investigation and research* regarding all the conditions affecting the work to be done and labor and material needed, and that his conclusion to execute this contract is based on such investigation and research, and not on the estimate of the quantities, *or other information prepared by the State Engineer, and that he shall make no claim against the State because any of the estimates, tests or representations of any kind affecting the work made by any officer or agent of the State, may prove to be in any respect erroneous.*"

The specifications provided: " Excavation shall consist of the loosening, loading, transporting and depositing of all material, whether wet or dry, of *every name and nature* necessary to be removed, for the purpose of forming the canal prism, ditches, pits for structures for obtaining material from borrow pits, or for any other purpose necessary to complete the works under contract, except as noted in paragraphs 16, 16a and 17."

Paragraphs 16, 16a and 17 of the specifications have no materiality to the questions we are now considering.

If claimant or its assignors has or had a valid claim against the state, its nature and character must be that of an action for deceit.

There is no valid claim for damages for the breach of the contract for there has been no breach. The contract provided for the excavation of all of the material, of every name and nature, within the lines of the contract at the uniform price of eighty-three cents per cubic yard. Claimant and its assignors have been required to do and have done no more.

Whatever of warranty or agreement as to the character of material to be encountered in the excavation operations is claimed

to have been suggested by the notations on the plans, was qualified and nullified and expressly waived by the provisions of the specifications, the information for proposers, and section 10 of the formal contract. The parties having defined their rights must be bound by such definition even though the result seem unjust, and no action or claim for breach of this contract can arise out of its performance exactly as it has been written. *O'Brien* v. *Mayor, etc., of New York,* 139 N. Y. 543; *Sundstrom* v. *State of New York,* 213 id. 68, 71; *Leary* v. *City of Watervliet,* 222 id. 337; *Pearson & Son, Inc.,* v. *State of New York,* 112 Misc. Rep. 29; *Jackson* v. *State of New York,* unreported decision, by the presiding judge of this court, concurred in by Webb, J., September, 1922.

If, however, the facts alleged and proved are sufficient to support a cause of action for deceit, that is, for active and intentional fraud in the procurement of the contract, such a claim might survive the performance of the contract (*Kountze* v. *Kennedy,* 147 N. Y. 124; *Wood* v. *Dudley,* 188 App. Div. 136), and might be maintainable against the state, despite its sovereign character, because of the provisions of section 47 of the Canal Law (Laws of 1909, chap. 13), although the proposition is not entirely free from doubt.

The gravamen of such an action is actual fraud and nothing less will sustain it. *Kountze* v. *Kennedy, supra.*

To sustain such a cause of action or claim it must be alleged and proved that representations as to material facts were made; that such representations were false; that the representations were known to be false; that the representations were made for the purpose of deceiving; or that the defendant had no knowledge whether the representations were true or false and made them recklessly, not caring what the fact might be and paying no heed to the injury which might ensue; that he who seeks recovery believed the representations to be true; that believing the representations to be true, he acted in reliance upon them and suffered damage.

Misjudgment, however gross, or want of caution, however marked, is not fraud. Intentional fraud as distinguished from a mere breach of duty or the omission to use due care is an essential factor in an action for deceit. *Kountze* v. *Kennedy, supra; Reno* v. *Bull,* 226 N. Y. 546.

The claim cannot be sustained as one for deceit for the reason that there were no *representations* as to the character of material which would be encountered in the performance of the contract.

It is true that there were many notations on the plans suggestive or indicative of the material likely to be encountered in the places

noted, but such notations were not intended by the state or understood by claimant's assignors to be positive, contractual and binding representations by the state as to the materials to be excavated.

In the first place, the state rested under no duty to prospective bidders to convey any such information or to make any such representations. The state engineer was required by the statute to make maps, plans and specifications for the work and to ascertain with all practicable accuracy the *quantity* of excavation and to make a detailed estimate of the costs of the same and to present the same to the canal board for its approval. After the approval thereof by the canal board, the statute provides that the maps, plans, specifications and estimates are to be exhibited to every person proposing or desiring to make a proposal for the work. Laws of 1903, chap. 147, § 6. The statute does not require that any statement as to the nature or *quality* of the materials to be excavated shall be noted on the plans or exhibited to proposers.

The subsurface investigations by the boring parties were necessary and, as the evidence reveals, were for the purpose of informing the state engineer's department as to the conditions to be encountered so that an estimate of the probable cost of the work might be prepared by the engineer as commanded by the statute. The notations upon the plans of the information disclosed by the subsurface investigation was for the benefit and use of the state engineer and his subordinates in the work of formulating and computing the estimate of cost of the work and for the checking up and approval by officers in the engineer's department of the work of their subordinates.

The work of the boring parties was performed in the field on the site of the proposed work in the years 1904 and 1905. The recorded results of their work were examined, studied and interpreted by the resident engineer and his assistants at his office at Fulton, where and by whom the plans and estimates were prepared in the years 1906 and 1907. They were then forwarded by the resident engineer to the special deputy state engineer, whose office was at Albany, for his examination and approval, and after his approval were delivered by him to the state engineer late in the year 1909 as complete and ready for use.

The usefulness of such notes on the plans as aids to the special deputy and the state engineer is apparent; this accounts for their presence there, and, in view of the language of the contract, seems conclusively to be the only office they were intended to perform.

This purpose and intention with respect to the subsurface exploration and the notes of the results thereof on the plans were distinctly recognized and conceded by counsel for claimant upon the argument, who claimed, however, that the work had been negli-

gently done and its results negligently and erroneously noted on the plans, and that claimant ought to recover on some theory of negligence.

That these notations were not intended or understood by either party to be positive, contractual and binding upon the state as representations, is conclusively established by the language of the contract which both parties intended to execute and did execute. They were necessarily, at most, expressions of opinion and judgment made for the benefit and guidance of state officers, not for the benefit or guidance of prospective bidders, for the state's subsurface explorations and soundings of the site of the contract had been by means of the wash drill and driven rod methods, in the great majority of instances by the latter method. That this was so appeared upon the face of the plans by the letters W. D. and D. R. at the various points on the plans where character of material was indicated, the meaning of which abbreviations was well understood by claimant's assignors.

All of the engineers who testified on the trial, on both sides, were in agreement that subsurface tests by means of either the wash drill or the driven rod method would not reveal with accuracy the nature and character, as to constituent elements, of the material penetrated in making the tests. The presence and elevation of rock may, however, be determined with a fair degree of accuracy by such methods, but it is not rock of which claimant complains.

Claimant's assignors, therefore, knowing in advance of bidding the methods of subsurface investigation which the state had employed, and as experienced contractors knowing that such methods do not and cannot reveal accurately the character of the material other than rock lying beneath the surface, knowing likewise when they submitted their bid that they were proposing to enter into a contract which would provide, among other things, that they had made their own investigation and research regarding the conditions affecting the work, that their proposal was based upon such investigation and research, and not on information prepared by the state engineer, and that they would make no claim against the state because any of the estimates, tests or representations of any kind affecting the work, made by any officer or agent of the state, might prove to be in any respect erroneous, cannot have regarded and understood the notations on the plans to be positive representations as to the conditions to be encountered.

It is no answer to contend that claimant's assignors did not have time to make the independent investigation of conditions which they have agreed in the contract they did make and upon which they have there agreed they based their bid. The agreement

was not that they had made such an investigation as they had time to make. The agreement was that they had made all of the investigation necessary to be made in order to acquaint themselves with the conditions which they would encounter in the performance of the contract upon which they hoped to enter. They were not obliged to make any bid. There was no coercion. Their act of submitting a proposal was purely voluntary.

Nor is it the fact that they had not sufficient time to acquaint themselves on their own account with the conditions which they would be likely to encounter in doing this work. The Barge Canal Act was passed in the year 1903 and by its terms provided that the route of the Oswego canal should follow the Oswego river canalized. This was a matter of common public knowledge. The evidence shows that the Stewart-Kerbaugh-Shanley Company, in which claimant's assignors were interested, had been, for a long time prior to the advertisement for proposals for doing the work under the contract involved in this claim, engaged in the work of dredging a section of the Oswego canal in the Oswego river upon a contract site immediately adjoining the site of this contract. If the Stewarts were interested in proposing to do the work of this contract when the same came to be let, as subsequent events have demonstrated that they were, there was abundant opportunity and time for them to have acquainted themselves with the situation and conditions surrounding dredging in the bed of Oswego river long before the state advertised for proposals for the doing of the work under this particular contract. But whether or not this is so, claimant's assignors were free moral agents; they knew what they knew and they knew the limitations upon their knowledge, and if, without coercion or persuasion, they voluntarily took a chance, submitted a proposal for doing the work and executed the contract now under consideration, they cannot now be heard to complain that they were deceived.

The claim cannot be sustained as one for deceit for the additional reason that neither *scienter* nor intention to deceive on the part of any responsible officer of the state charged with the duty of making, or who in fact made, the contract with claimant's assignors, has been alleged in the claim or proved upon the trial.

The statute authorizing the making of this contract and others of its kind provides that the work of canal improvement and construction authorized by the act should be done by contract, to be entered into on the part of the state by the superintendent of public works in accordance with maps, plans and specifications to be made by the state engineer when, and after, the said maps, plans and specifications had been adopted by the canal board. Laws of 1903, chap. 147, §§ 6, 7. This contract was signed, on

the part of the state, by Winslow M. Mead, deputy superintendent of public works, the regularity of which is not questioned.

There is no allegation in the claim and there was no proof upon the trial that the state superintendent of public works, or his deputy who executed this contract, or any member of the canal board knew at the time the plans were adopted or the contract signed that any of the notations on the plans as to the character of the materials which would be encountered in the performance of the proposed contract were false and deceptive or that such notations were made and placed upon the plans for the purpose of, and with the intent to, deceive claimant's assignors or prospective bidders generally.

The nearest approach in the claim to allegations of *scienter* is the allegation in the 6th paragraph of the claim, viz.: " The examinations and investigations of the site of the work and material to be excavated claimed to have been made by the State did show, *or would have shown, if made,* the same to be untrue and false, and, therefore, the State was and is chargeable with knowledge of the untruth and falsity thereof and with the knowledge of the State's officers, agents and employees, of the untruth and falsity thereof;" the further allegation in the same paragraph: " The representations as to the nature of the dredging and excavation to be done did not approach approximate correctness and were known by the State to be false, fraudulent, mistaken, erroneous and misleading, *or could have been,* with proper diligence and reasonable care, *ascertained to be false, fraudulent, mistaken, erroneous and misleading,* and were made without sufficient information as to their accuracy, which lack of information, due to the frauds, acts, omissions and negligence of the State constituted fraud as to claimant's assignors and to claimant;" and the further allegation in the same paragraph: " which differing materials were known by the State's officers to exist, *or which they should have known existed,* had they made the borings, soundings and observations which the plans indicated, warranted and represented were made, or which by due diligence and reasonable care, they could have ascertained to exist."

The allegations of the claim above quoted are not allegations of knowledge of falsity on the part of the state and its responsible officers. The allegations are in the alternative and aver either knowledge or negligence. But negligence is not fraud, and carelessness will not take the place of *scienter* as a necessary element in an action for deceit (*Kountze* v. *Kennedy, supra; Reno* v. *Bull, supra*), and the allegation in the alternative of either *scienter* or negligence does not fulfill the requirement of the rule that *scienter* must be pleaded in the complaint in an action for deceit. 20 Cyc. 99, and cases there cited.

The claim filed by claimant is utterly barren of allegation of intention of the state engineer, of the canal board, of other state officers, or in fact of anybody else, to deceive claimant's assignors or prospective bidders generally. Such an allegation is indispensable in an action for deceit.

Upon the trial there was no evidence of any character that the superintendent of public works or any member of the canal board, including the state engineer, had knowledge of any falsity in the plans or in any of the notations thereon as to materials to be excavated, or of intention on the part of any of them to deceive claimant's assignors or prospective bidders generally. In the view of the evidence most favorable to claimant, the most that can be said of it is that it would support findings that certain subordinates of the state engineer, namely, laborers in the boring parties, did their work and recorded the results of their observations in an inefficient, careless, slipshod and inaccurate manner; that another subordinate, an assistant engineer, in an unwise, inexperienced, careless and unwarranted manner, misinterpreted some of the records of the boring parties, placing the results of his misinterpretations on the plans and omitting from the plans some of the information disclosed by the records of the boring parties, and that another subordinate, the special deputy state engineer, in good faith, approved the same and transmitted them so approved to the state engineer.

There is no evidence that any of the shortcomings or faulty work of his subordinates were communicated to or known by the state engineer. On the contrary, the undisputed evidence is that the plans came to the state engineer duly certified and purporting on their face to have been duly checked by the subordinates in his department, to whom the work of the preparation thereof had been committed, approved by the special deputy state engineer without any suggestion that they were inaccurate in any way, and were accepted, adopted and used, and were presented by him to the canal board in entire and absolute good faith.

There is no evidence that any member of any boring party, or the resident engineer, or the special deputy state engineer had any intention of deceiving prospective bidders, or acted in any other manner than in honesty and good faith. The evidence discloses no way in which any could hope to gain by deception or lose by doing their work honestly.

That there was some incompetency, carelessness and bad judgment on the part of some of these subordinates is apparent, but this is not fraud.

The canal board in good faith adopted the plans presented to it by the state engineer, whereupon the superintendent of public

works also in good faith and with perfect innocence of purpose, so far as the record discloses, relying upon the integrity thereof, negotiated and signed the contract with claimant's assignors.

In such circumstances, it cannot be said that the notations on the plans as to the material to be excavated constituted representations made by the superintendent of public works, or by the canal board, or by the state engineer, with intention to deceive, or, recklessly, not knowing and not caring what the fact might be and heedless of the injury which might ensue.

The work of construction of the Barge canal was a work of mammoth proportions, involving multitudinous details. It was impossible for the superintendent of public works, the state engineer or the canal board to have personal knowledge of every fact and condition incident to the work. Of necessity they were obliged to depend upon subordinates for information as to facts and conditions with which they were obliged to deal. The state engineer was justified in accepting the reports and recommendations of his subordinates and the superintendent of public works was justified in accepting these plans from the state engineer and the canal board and in believing them to be correct. His doing so, in good faith, was not reckless and heedless, and so fraudulent, especially in a case such as this where bidders for the work were to be required to agree, and did agree, to make their own investigations and explorations and to rely solely thereon, and to make no claim in case any of the estimates, tests, or representations of any kind affecting the work to be done, made by any officer or agent of the state, might prove to be in any respect erroneous.

These state officers and employees are presumed to have acted honestly and without intent to deceive and defraud, not alone because they are state officers, but because there is a general presumption of honesty and integrity to which every one is entitled, and in every case where a defendant is charged with fraud the evidence to establish the fraud must be such as to fairly and reasonably establish the dishonesty and fraudulent intent and to exclude any other hypothesis. Where the evidence is capable of an interpretation which makes it equally consistent with the absence as with the presence of a wrongful intent that meaning must be ascribed to it which accords with the absence of guilt. Fraud can be established only by proof of such circumstances as are irreconcilable with any other theory. *Morris* v. *Talcott*, 96 N. Y. 100; *Lopez* v. *Campbell*, 163 id. 340.

There is a further reason why claimant should not recover under item 1 of the claim. Claimant's assignors commenced the work of excavation under this contract at that section of the contract site known as the Hinmansville cut, which section, accord-

ing to claimant's contention, presented the worst example of the variance between the character of materials to be excavated as indicated by the plans and that which was actually encountered in performing the work.

The work was started at this section on August 7, 1910. Prior to January 9, 1913, the date of the assignment of the contract to claimant, in fact prior to November 1, 1911, claimant's assignors had excavated in that section of the contract 113,536 cubic yards, about one-half of all of the material to be excavated in that section as provided by the plans and contract. The total quantity of excavation in the entire contract as shown by the final estimate and paid for by the state was 1,141,878 cubic yards, of which 349,292 cubic yards, or nearly one-third of the entire work, was done before January, 1913, when the contract was assigned to this claimant.

In the meantime protests, many and repeated, both oral and written, had been made by claimant's assignors and their agents to various state employees and officers, complaining that the material which they had encountered, and were encountering, was harder and much more difficult and costly to excavate and handle than the plans indicated it would be. As early as the summer of 1910, Mr. Hill, chief engineer of the claimant's assignors, and later employed in the same capacity by claimant, complained to Mr. Berry of the state's forces of the hard material in Hinmansville cut, not shown on the plans, and in the winter of the same year complained on the same subject to Resident Engineer Ripley of the state.

On March 15, 1911, claimant's assignors addressed a letter to Hon. J. A. Bensel, state engineer and surveyor, which states, among other things: " We have just had our engineers go over this entire work, taking soundings, borings, etc., and making new cross-sections, to ascertain the amount and the exact classification of each of the materials to be excavated, and we find that above Phœnix, instead of there being some 50% of soft or loose material, which we had intended to do with a hydraulic dredge, and which method was no doubt contemplated in the selection and location of the spoil area adjacent to this work, that in place of finding this percentage of soft material, we find that at least 90% of the material is rock, sand and gravel or cobble, hence we will have to abandon the idea of using hydraulic dredge and use dipper dredge. * * * Your reports will, no doubt, show that below Phœnix and particularly at Hinmansville Cut-Off, the material we have taken out, in place of being of a kind to be taken out with a hydraulic dredge, is as a matter of fact of a nature that required blasting and, in most instances, must necessarily, therefore, be done by dipper dredge."

**On** January 9, 1913, Alexander M. Stewart and James C. Stewart were respectively the president and a vice-president and also directors of the claimant corporation. Other officers were Henry W. Lowman, second vice-president; Charles F. Franson, third vice-president; William A. Rowan, treasurer, and James B. A. Fosburgh, secretary. Messrs. Rowan, Franson and Fosburgh were also directors of the corporation.

By a resolution adopted at a meeting of the board of directors of the corporation on the 9th day of January, 1913, Mr. Alexander M. Stewart and the secretary were authorized to accept the assignment of this contract from the copartnership firm of James Stewart & Co. and to execute on behalf of the company all such instruments as are proper and requisite in the premises.

The assignment of this contract is executed on the part of the copartnership by both partners and is signed by A. M. Stewart and J. C. Stewart, the copartners.

The assignment agreement was executed in the name and on the part of claimant corporation by A. M. Stewart, president, under the corporate seal of the company attested by its secretary.

The assignment agreement in terms " sells, sets over, transfers and assigns all right, title and interest in said contract No. 39, entered into on the 15th day of April, 1910, by the said copartnership and the State of New York, together with all money due or to become due thereon, including all retained moneys, to the said corporation of James Stewart & Company, Inc.," and further provides: " and the said corporation by this instrument acquires and takes over all right, title and interest of the said copartnership in said contract No. 39 referred to and described above and hereby assumes all the obligations and responsibilities to do and perform the work embraced within the said contract No. 39, entered into on the 15th day of April, 1910, by the said copartnership and the State of New York, *the said corporation obligating itself to comply with all the conditions, restrictions and obligations embraced in said contract, specifications and plans,* alterations and modifications, which are or may be a part thereof."

The assignment agreement does not assign and transfer to claimant any claim against the state of New York for damages resulting from any breach on the part of the state of any of the provisions of the contract, which had theretofore occurred, nor for damages for the inducement and procurement of the execution of the contract by the assignors thereof by means of false and fraudulent representation on the part of the state of New York or its officers, or of claims of any other nature except for retained percentages.

It is further recited in the assignment agreement that the same

was subject to the written consent of the superintendent of public works or of the deputy superintendent, as provided in section 3 of the contract, and that it should be binding upon the parties thereto only when the written approval of the superintendent or deputy superintendent of public works shall be given thereto.

Under date of January 9, 1913, Messrs. James C. Stewart and Alexander M. Stewart, claimant's assignors, jointly with claimant, acting by Mr. A. M. Stewart, its president, petitioned the superintendent of public works of the state of New York to give his written consent to the assignment of the contract, representing in the petition that by the terms of the assignment of the contract the corporation had obligated itself to do and perform the things in said contract which the copartnership firm of James Stewart & Co., as principal, had bound itself to do and perform.

On June 18, 1913, Hon. Duncan W. Peck, state superintendent of public works, gave his approval to the assignment of this contract in writing, reciting as one of the considerations for such approval the fact that the claimant corporation had filed in the superintendent's office an instrument in writing duly accepting the assignment of said contract and assuming all liabilities and obligations of the said copartnership under contract No. 39.

These then must be inescapable conclusions to be drawn from the situation above outlined, viz.:

If, at the time of the assignment of this contract, there was any valid claim for damages, upon any theory, because of the increased cost of performing the excavation work which was done prior to the assignment, that claim was the property of claimant's assignors and was not by the assignment transferred to claimant. *Fox* v. *Hirschfeld*, 157 App. Div. 364; *Ettar Realty Co.* v. *Cohen*, 163 id. 409.

When in January, 1913, claimant corporation took over by assignment this contract, it knew, because its president and vice-president knew, as the result of the soundings, borings and cross-sections of the entire work, which, as copartners, they had caused to be made prior to March 15, 1911, the exact classification of each of the materials to be excavated, and this information was supplemented and confirmed by the information they had obtained in the course of excavation of nearly one-half of the material in the Hinmansville cut and nearly one-third of all of the excavation called for by the contract and plans. If the plans did not with reasonable accuracy indicate the actual conditions encountered and to be encountered, the Stewarts then knew it; hence claimant knew it, and, therefore, was not deceived or misled.

If claimant was deceived and misled, it was by its own officers, the Stewarts.

By petitioning the superintendent of public works for his approval

of the assignment, representing in the petition that it had become obligated to perform all of the terms and conditions of the contract, at the time having knowledge of the actual conditions encountered and to be encountered, it ratified the terms of the contract, waived any inaccuracies of the plans, and is now estopped by such conduct from asserting any claim against the state based upon the alleged misrepresentative character of the plans.

For all the reasons above stated item 1 of claimant's claim should be dismissed.

If, however, claimant is entitled to recover on item 1 of its claim, the measure of damages applied in the decision about to be made is not the correct measure of damages.

It is the well-settled law of this state that the purpose of an action for deceit is to indemnify the party injured. All elements of profit are excluded. The true measure of damages is indemnity for the actual pecuniary loss sustained as the direct result of the wrong. The rule of damages in actions for fraud is not the same as the rule in actions for breach of warranty. 20 Cyc. 143; *Reno* v. *Bull, supra; Falk* v. *Hoffman*, 233 id. 199, 201; *Sigafus* v. *Porter*, 179 U. S. 116.

Applied to this claim the measure of damages would be the difference between what it cost claimant and its assignors to perform the entire contract and the amount which was paid by the state for such performance. That the work of the contract cannot be divided up into pieces or sections for the purpose of measuring the damage is recognized by counsel for claimant who at page 13 of claimant's reply brief states: " Fraud vitiates the entire contract. The measure of damages in that event contemplates the entire contract and not portions thereof."

Unfortunately I have been unable to discover in the evidence the actual cost to claimant and its assignors of the performance of the entire contract. On the argument claimant's counsel was asked if there was evidence as to what it did actually cost the contractor and he replied that there was not.

If, therefore, the rule of damages above stated is the correct one and claimant is to have an award, it would seem necessary that evidence of the actual cost of the performance of the work and of the amount paid claimant and its assignors therefor should be placed in the record.

From aught that appears in the record it may be that in spite of the conditions complained of by claimant the performance of this contract yielded a handsome profit to the contractors, in which case they have suffered no loss and would be entitled to no recovery.

If, however, it were permissible to split up the work of this contract in sections, separating the profitable from the unprofitable

sections and the correctly represented sections from those mis-represented for the purpose of allowing a recovery as to the misrepresented sections, the amount proposed to be awarded the claimant is grossly in excess of the loss resulting from the performance of the work in the misrepresented sections.

The amount proposed to be awarded under item 1 is $369,237.

According to the schedule introduced in evidence by claimant and appearing at pages 5474 and 5475 of the stenographer's minutes, it appears that in what claimant claims to be the misrepresented sections, namely, from station 28 to 63, from station 124+50 to 210, from station 252 to 270, from station 270 to 596, and in the dyke at Phœnix, there was a total of 751,909 cubic yards, the estimated (not actual) cost for the excavation of which was $654,043.50. For the excavation of this material claimant has been paid, at the contract rate of eighty-three cents per cubic yard, the sum of $624,084.47, indicating a loss to claimant and its assignors of only $29,959.03 as against $369,237, proposed to be awarded.

As against this result which I have reached, it may be urged that here no account has been taken of the large cost of excavation in the rock areas. This is a just criticism but necessarily results from the unwarranted splitting up of the work of this contract in the attempt to measure claimant's damages. If the work of the contract were considered as an entirety and the difference between its actual cost and the amount paid for the work were ascertained, that method would give proper weight to the larger cost of rock excavation in the uncomplained of areas and the result obtained would represent what claimant and its assignors actually lost by the performance of this contract excluding all considerations of profit which are not permissible in an action for deceit.

In connection with this matter of rock excavation, it may be noted in passing that, in the course of the performance of the contract, claimant and its assignors excavated 222,858 cubic yards of rock at and from locations where the plans correctly indicated both location and quantity of rock.

According to the plans and contract this rock when excavated was to be deposited in designated spoil banks on land. At the request of claimant and its assignors, and in part at least upon and because of representations and complaints on the part of claimant's assignors that much hard and difficult material had been encountered at locations where soft material was indicated on the plans, the state permitted claimant and its assignors to deposit this excavated rock in the river instead of transporting it to and depositing it upon the upland, thus reducing the cost of handling such rock in the amount of forty-three and four-tenths

cents per cubic yard, accomplishing a saving to claimant and its assignors of $96,720.37. Claimant has been paid the full contract price for excavating this rock, and, in computing claimant's loss and damage, the proposed decision has taken no account of this saving or reduced cost, and has allowed the state no offset or other credit on account thereof. If the correct measure of damage had been applied, viz., the difference between the actual cost of the performance of the entire contract and the amount paid therefor by the state, this saving would have been reflected and the recovery against the state would have been by so much reduced.

In reaching the conclusion that claimant is entitled to recover $369,237, the prevailing decision has applied neither of the above methods. It has not dealt with the contract work as an entirety, but has undertaken to separate the correctly represented from the misrepresented sections of the work, and has endeavored to ascertain the increased cost of performing the work in the misrepresented sections over what would probably have been the cost of doing the work had the conditions encountered been of the character represented by the plans, and has concluded the amount of that increased cost to be the amount of the award proposed to be made.

This method not only permits claimant to have and enjoy whatever profit there was in the performance of the contract in the sections of the work as to which there is no complaint, but also allows a profit for the work in the misrepresented sections.

A single instance will suffice to illustrate this:

In that section of the contract between stations 28 and 63, the amount of excavation was 34,483 cubic yards, the actual (estimated) cost of the excavation of which was eighty-nine and nine-tenths cents per cubic yard, amounting to $31,000.21. It is claimed that had the material between those stations been of the character as shown on the plans, the reasonable cost of its excavation would have been twenty-seven and seven-tenths cents, amounting to $9,551.79, or an increased cost of sixty-two and two-tenths cents per cubic yard, amounting to $21,448.42, and this is asserted to be its damage for the misrepresentation in this section.

Claimant has, however, been paid for the excavation in this section at the rate of eighty-three cents per cubic yard, amounting to $28,620.89. The amount of its loss on this section if no profits are allowed would be the difference between $31,000.21 and $28,620.89, viz., $2,379.32. If, in addition to what has been paid, there is to be added the increased cost, claimant will then have received $1.452 per cubic yard for this excavation, amounting to $50,069.31, or a profit of fifty-five and three-tenths cents per cubic yard, amounting to $19,069.10 over the actual cost to it of doing the work.

The other items of claimant's schedule similarly treated will produce similar results.

Of course the award about to be made is not quite so great in amount as claimant claims, the amount of the claim according to the schedule above referred to being $411,008.26. The difference, however, is one of quantities, not of methods. The method employed by the majority of the court is the increased cost method employed by claimant, as plainly appears by the twenty-fifth finding of fact, and will, if it prevails, result not alone in compensating claimant and its assignors for losses sustained in the performance of the work in the misrepresented sections, but also in paying them a profit on that work contrary to the law as to the proper measure of damages as laid down in the authorities above cited.

The result of the above discussion is that item 1 of the claim should be dismissed on the undisputed facts established by the record, and if an award on any theory could be justified, it should be for an amount less than one-tenth of the amount proposed to be awarded.

The propositions of fact and of law here considered have been urgently pressed for the consideration of the members of the court participating in the decision of this claim, and the necessity as well as the propriety of deciding the questions so raised urged. As the decision now stands the questions have not been decided. They have been ignored.

It was and is the duty of the court to decide these questions for they vitally affect claimant's right to recover. The court cannot evade its responsibility by reason of the fact, if it be the fact, that the attorney-general has overlooked them or has failed to present requests for findings of fact or conclusions of law or both, sharply raising such questions.

This court is an auditing body (*People ex rel. Swift* v. *Luce*, 204 N. Y. 478–486) and it is its duty, independent of any duty which may have been imposed upon the attorney-general, to assert and sustain in favor of the state every legal defense disclosed by the record which will defeat or diminish claims presented against the state. Court of Claims Act, § 26; Penal Law, § 1863.

The startling statement in the prevailing opinion that these questions have no reference to the merits of the controversy is no decision of the questions and proves beyond argument that no consideration has been given to them. Had they received even casual consideration, it would not have been asserted that the questions whether or not the claimant is the owner of all of this claim, if in fact and law there ever was a valid claim, whether or not this claimant has been deceived and defrauded, whether or

not claimant has voluntarily waived its claim, if it ever had a valid one, whether or not claimant has by its conduct estopped itself from asserting this claim, whether or not the damages proposed to be awarded are unlawful in character and excessive in amount, and are to be awarded in total disregard and violation of the rule as to the measure of damages announced by the court on the trial, " have no reference to the merits of the controversy."

If this award shall be permitted to stand, it will result in the payment to this contractor of nearly $400,000 of the state's money without a fair trial and without fair consideration and with no decision of important questions, serious consideration of which would in my judgment force a dismissal and disallowance of this part of the claim.

A faithful guarding of the interests of the state and its treasury demands that the decision be not permitted to stand without review by an appellate tribunal.

The record in this case is a long one, consisting of considerably more than 5,000 pages of stenographic minutes. If an award is to be made to claimant in this case based upon item 1, evidence of the actual cost to the contractors of the performance of the entire contract and of the amount paid by the state for the performance of the work should be placed in the record so that an appellate court will have before it, if there is appeal from the decision of this court, all the facts necessary for the application of a correct rule as to the measure of damages and thus make unnecessary a retrial of the case.

Upon the record as it now stands, I dissent from and disapprove of the fifth, seventh, eighth, ninth, tenth, eleventh, eighteenth, twentieth, twenty-first, twenty-fourth, twenty-fifth, fortieth, forty-first, forty-second and forty-third findings of fact as not sustained by the evidence.

I also dissent from the first, second, fifth, seventh and twelfth conclusions of law.

There should be found and incorporated in the decision findings of fact and conclusions of law as follows:

### FINDINGS OF FACT.

1-A. The assignment of contract No. 39 by James C. Stewart and Alexander M. Stewart, copartners, to James Stewart & Co., Inc., the claimant herein, which became effective on June 18, 1913, the date of its approval by the state superintendent of public works, did not in terms or effect assign to claimant any claim or cause of action which the copartnership may then have had or have claimed to have had against the state.

2-A. At the time of the assignment of contract No. 39 by James C. Stewart and Alexander M. Stewart, copartners, to claimant corporation, James Stewart & Co., Inc., Alexander M. Stewart and James C. Stewart, the copartners, were respectively the president and a vice-president of claimant corporation, both likewise being directors. Other officers of claimant corporation at that time were Henry W. Lowman, second vice-president; Charles F. Franson, third vice-president; William A. Rowan, treasurer, and James B. A. Fosburgh, secretary. Messrs. Rowan, Franson and Fosburgh were also directors of the corporation.

3-A. The total quantity of excavation in the entire contract as shown by the final estimate, which was paid for by the state at the contract rate of eighty-three cents per cubic yard, was 1,141,887 cubic yards. Of this amount 349,292 cubic yards were excavated by the copartnership firm, James Stewart & Co., prior to January, 1913, the date of the assignment of the contract to claimant James Stewart & Co., Inc. Of the amount so excavated prior to the date of the assignment, 113,536 cubic yards thereof were excavated at that section of the contract site known as the Hinmansville cut, and was nearly one-half of all of the excavation work done in the Hinmansville cut.

4-A. Prior to the assignment of the contract to claimant, and on March 15, 1911, claimant's assignors wrote a letter to the state engineer and surveyor stating, among other things: "We have just had our engineers go over this entire work, taking soundings, borings, etc., and making new cross-sections, to ascertain the amount and the exact classification of each of the materials to be excavated, and we find that above Phœnix, instead of there being some fifty per cent of soft or loose material which we had intended to do with a hydraulic dredge, and which method was no doubt contemplated in the selection and location of the spoil area adjacent to this work, that in place of finding this percentage of soft material, we find that at least ninety per cent of the material is rock, sand and gravel or cobble, hence, we will have to abandon the idea of using a hydraulic dredge and use dipper dredge. * * * Your reports will, no doubt, show that below Phœnix, and particularly at Hinmansville Cut-Off, the material we have taken out, in place of being of a kind to be taken out with a hydraulic dredge, is as a matter of fact of a nature that required blasting, and, in most instances, must necessarily, therefore, be done by dipper dredge."

5-A. When in June, 1913, claimant corporation took over this contract by assignment from the copartnership, claimant knew, as the result of the soundings, borings and cross-sections of the entire work, referred to in the letter of March 15, 1911, the exact classification of all of the material to be excavated and the infor-

mation thus obtained had been supplemented and confirmed by the information obtained in the course of the excavation of nearly one-half of all of the material in the Hinmansville cut and nearly one-third of all of the excavation called for by the contract and plans, hence it has not been deceived by the state.

6-A. In June, 1913, claimant corporation obtained from the state superintendent of public works his approval of the assignment to it of contract No. 39 upon the representation and agreement that claimant had obligated itself by agreement with its assignors to do and perform the things which said assignors had by the contract obligated themselves to do and perform, claimant having at that time accurate knowledge of the actual conditions which had been encountered and also those yet to be encountered. It thereby waived any claim it might have had because of any variance between conditions indicated by the plans and conditions actually encountered.

7-A. At the time contract No. 39 was entered into between James Stewart & Co., the copartnership firm, and the state, neither the state superintendent of public works nor the state engineer and surveyor, nor any member of the state canal board had any knowledge that the plans did not accurately indicate the nature and character, location and quantities of all materials to be excavated by the contractor.

8-A. At the time of the execution of the contract by James Stewart & Co., copartners, and the state of New York, there was no intent on the part of the state superintendent of public works or the state engineer and surveyor or of any member of the state canal board to deceive or defraud James Stewart & Co., or any other person, firm or corporation.

9-A. Claimant and its assignors have already been paid the full contract price of eighty-three cents per cubic yard for all of the excavation called for by the plans including the excavation of the hard and difficult material at locations where the plans indicated soft material would be found.

10-A. In the course of the performance of the contract, claimant and its assignors excavated 222,858 cubic yards of rock at and from locations where the plans correctly indicated both location and quantity of rock. According to the plans and contract this rock when excavated was to be deposited in designated spoil banks on land. At the request of claimant and its assignors, and in part at least upon and because of representations and complaints on the part of claimant's assignors that much hard and difficult material had been encountered at locations where soft material was indicated on the plans, the state permitted claimant and its assignors to deposit this excavated rock in the river instead of transporting it

to and depositing it upon the upland, thus reducing the cost of handling such rock in the amount of forty-three and four-tenths cents per cubic yard, accomplishing a saving to claimant and its assignors of $96,720.37. Claimant has been paid the full contract price for excavating this rock.

11-A. The total amount of excavation removed and handled by claimant and its assignors from the sections of the contract site where the material encountered was harder and more difficult to handle than the plans indicated was 751,909 cubic yards, the actual cost of which to the claimant and its contractors did not exceed $654,043.50. Claimant and its assignors were paid by the state for this work the sum of $624,084.47. The actual loss to claimant and its assignors resulting from the performance of this work under the conditions encountered was not more than $29,959.03.

### CONCLUSIONS OF LAW.

1-A. The assignment of contract No. 39 from James C. Stewart and Alexander M. Stewart, copartners, to claimant did not in terms or effect assign to claimant any claim for damages which the copartnership may have had because of the fraudulent procurement of the contract or otherwise.

2-A. Claimant having accepted the assignment of contract No. 39 with full knowledge of the conditions encountered and to be encountered in its performance and having agreed to perform the contract, and having obtained the approval of the state superintendent of public works upon the representation and agreement that it had by the assignment agreement obligated itself to fully perform the contract, it thereby waived and is estopped from asserting any claim based upon any variance between the conditions indicated by the plans and those actually encountered either by its assignors or itself.

3-A. The state is not chargeable with responsibility for fraudulent acts, concealment, representations or intent, by or on the part of members of boring parties or other subordinates of the state engineer and surveyor, if the state engineer and surveyor, members of the canal board and state superintendent of public works are without knowledge of the fraudulent acts, concealment, representations and intent, and themselves act honestly and in good faith.

4-A. Section 10 of contract No. 39 is a complete bar to this claim.

5-A. In view of section 10 of contract No. 39, the contract having been fully performed on both sides, this claim is not maintainable as one for the breach of the contract or of a warranty therein.

6-A. This claim, if maintainable at all, must be maintained as one for damages for fraud and deceit in procuring the contract.

7-A. In an action or claim for fraud or deceit in procuring a contract, the measure of damages is the difference between the cost of performance and the amount received for and from such performance. No element of profit can be allowed to enhance the damages.

8-A. It is the duty of this court, as an auditing body, to invoke and enforce every legal defense disclosed by the record which will defeat or diminish this claim, independent of any duty which the law imposes upon the attorney-general to defend the state against the claim.

9-A. Item 1 of this claim should be disallowed and dismissed.

Judgment accordingly.